Reese, J.,
delivered the opinion of the court.
John Henderson, late of the county of Rutherford, in the State of Tennessee, on the 13th of September, 1833, duly *31 made and published his last will and testament, and in that year departed this life. This will directs, that all his just debts shall be paid, and adds, “after which, I give and dispose of my property, both personal and real, in the the following manner to wit: I give and bequeath to my beloved wife, Sarah Henderson, the object of my tender regard,, all my estate, both real and personal, including negroes, horses, and cattle, and every other species of property, as well that which is now in possession and that which may be hereafter acquired, together with my money on hand, debts, claims of all kinds or description whatever, and all my lands, tenements, hereditaments, with all appurtenances belonging or appertaining, to her, her heirs or assigns, during her natural life; at her death, it is my will and desire she should have the disposal of one half the property to whomsoever she thinks proper, the other half of my property, both real and personal, to be divided among my brothers and sisters, or their heirs. It is also my will and desire that all my estate, both real and personal, remain unsold by my executrix hereinafter named. It is likewise my will and desire that my brother, Logan Henderson and Samuel Anderson, Esq. of Murfreesborough, should counsel, assist, and help my wife, Sarah Henderson, and that she should not act contrary to their counsel. It is likewise my will and desire and I do hereby appoint my beloved wife, Sarah Henderson, executrix of my last will and testament, giving her full power and authority to execute the same.
The said Sarah proved the will and took upon herself the execution of the same, giving certain of the complainants as her sureties. The estate consisted at the time of testator’s death of a valuable tract of land, in the county of Rutherford, whereon he had resided, of about twenty slaves, of a considerable stock of horses, cattle, &c., of household furniture, and implements of husbandry, of several hundred dollars in money and several thousands in debts. After residing some years on the farm, Sarah H.enderson, the widow, intermarried with the defendant, ^Wm. Vaulx, and removed to his residence, in Davidson .county, taking with her a portion of die slaves and leaving a portion on the Rutherford fprpa.
*32 The bill charges that at the time of its being filed, the defendant, Wm. Vaulx, was about to remove all the negroes, or a large portion of them, to the State of Mississippi, for the purpose of making sale of them; and it alleges, that the sale or settlement of them there would injure their health, impair their value, render doubtful the identity of them and their increase, and greatly endanger the title of those in remainder. It appeals from the answer and proofs, that the defendant, and a man of the name of Carter jointly own a tract of land in Jackson county, Mississippi, and have each of them several negroes of their own upon it, and are carrying on the cotton growing business in partnership, that Carter lives there, except in the summer season, and that it was and is the purpose of defendant to remove the slaves in question to that farm, and to reside there himself with his fnmily, except during the summer and fall months. Several other matters are s'ated in the pleadings, which make it necessary to give a construction to the will above recited, and to determine the rights of the parties under it.
First, then, what is the character and extent of the interest to which Sarah Vaulx, late Sarah Henderson, is entitled by the terms of said will. It is urged in argument that she is entitled to the money and cboses in action absolutely, because it is said the testator, in the portion of the will which grants the life estate, distinguishes between property and money, using the former word in a limited and restricted sense, and in the devise over of a moiety uses the term property in the same sense, excluding the idea of money. It is believed this view of the matter is erroneous. The will commences by stating, that testator gives and disposes of his property, both real and personal, in the following miinner; the manner is by giving to his wife all the estate, both real and personal; he shows then his sense of the terms, real and personal estate, by adding, perhaps from abundant caution, that it includes negroes, horses, cattle, and every species of property then possessed, or to be acquired, together with his money on hand, debts, claims and demands of every kind and description whatever, and all his lands, tenements, or hereditaments, with all appurtenances belonging ’or apper- *33 raining. In tlie power of íl>ypos-!í¡cn given to her, as well 03 tlio devise ever, having alíe, ’y -explained his meaning, ha contents himself, as was n:-,'\,d, v..\h the simple use of those fal’y explained terms, ‘hoy property, bo'dí real and pnsoral.” Jt is said again, that although of a moiety of the estate, both red a::tl perona!, which is limited in remainder, Sarah Vatil:: may be cr.iided to a life estate only; yet of the other moiety which is not limited in-remainder, but of which a power to dispose at her death to whomsoever she may think ptoper is ghen, that moiety, .by virtue of such non-limiia.icn over and power cf disposition at her death, is vested absolutely in the wife. Vo Sustain this position many authorities have been referred to, and especially the cases of Smith v. Bell, in Martin & Yerger; and Davis vs Bridgman, 9 Yerger. With the authority of those cases, although the former. was dhlb/e.My decided in the supreme court cf the United Otates, and from the latter Judge Whyte dissented, I tan not at liberty to wage a controversy — lam not disposed to do so; it have been in the ‘habit of thinking them correctly decided, 'i’hero is one thing in which all the judges who have passed upon- these cases concur, that is, that in the construction cf wills, the.-intention of the testator is a leading object of inquiry, and that almost every caso will depend inu.-ii upon its own terms and circumstánces.
In the case of Davis vs. Bridgman, where a life estate is given to the wife, with power r.t her death to dispose of the properly in any mode- sh-e might see proper, Judge Catron urges, that it was consistent with the intention of the testator, that she should have sold or given away the property during her life, that it could not be impounded, and that the clause meant nothing more than that she should live upon and enjoy the property in her own way, during her life, and at her death dispose of it as she thought proper, in this case, however, from tiie power of disposition at the death of the wife, no such inference of the probable intention can be drawn, because the testator says, “it is my will and desire that all my estate, both real and personal, remain unsold by my executrix, hereinafter named.” Ho also expresses his desire that his wife should not act contrary to the counsel of *34 L0gan Henderson and Samuel Anderson. These clauses, ; the first, leave no doubt that testator’s intention * J 7 was to limit and restrict the wife’s power of disposing of the . . , , , r , .. . , ‘ ° property to the time of her death; and if it be proper as supposed by C. J. Marshall, in the case of Smith against B ll, and Ch. J. Catron, in Davis vs. Bridgman, as certainly in doubtful cases, it is,- to look into the circumstances and situation of the parties in interest, and into those of the estate,
to ascertain the intention of the testator; there is nothing in either, in the present case, tending in the slightest degree to control the expressed wish and intention of the testator, that all his property should remain unsold by his executrix. It is not necessary, and would be premature, conclusively to settle this point. It is not my intention to do so. It will be time enough authoritatively to settle that question, when the life estate shall fall, and the tenant for life at her death shall have made no disposition of a moiety of the real and personal estate; an event which may never happen. It is oroper, however, for some purposes of this case, that an opinion on the point should be now given. The conclusion to which my mind J ¡as come is, that the wife has only a life estate, as well of the moiety, which she may dispose of at her death, as of the moiety limited in remainder. It is contended, however, that from the nature of a portion of this property, being of those things of which the use is in the consumption only, a good remainder cannot be limited, and the first taker will enjoy the absolute interest.
It appears from numerous cases, to which it were useless to refer the learned counsel, because relied on by them and read on the trial, that where a specific bequest for life,-with or without limitation in remainder, is made of wine, corn, hay, or other things, whose use consisted in being consumed, the first taker is entitled absolutely. But when this bequest is residuary, and not specific, then such chattels must be sold, and the interest only of the proceeds given to the first taker, and the principal is preserved for him in remainder. Accordingly, complainants insist that such property, if it remain on hand in this case, shall be sold, and if not, shall be accounted for. .
*35 But the will, in this case, directs that none of the proper- ’ ’ 1 , ¡y shall be sold; the operation of which direction, it is believed, will give to the wife the absolute interest in such chattels, in the same manner as if the beques.t were specific. The reason why a specific bequest to one for life of things useful only, as ihey are consumed, confers the absolute interest, though limited in remainder, is that the specific bequest shows that the primary purpose of the testator is, that the first taker should at all events enjoy the property or thing, not merely its value, while its nature is inconsistent with his enjoyment, and that of the remainder man at the same time. So here, if the testator give property of this description to his wife, with remainder over, and direct her not to sell it, she has no property in it, but a burthen, unless she uses it, and therefore, as upon the supposition, she cannot use it at all, without, in (lie very ac it, of using it, she consumes she must have it absolutely. But this does not extend to that species of property, which, though impaired and worn out in the course of being used, is not useful merely as it is consumed.
Secondly — The results then of this view of the extent and character of Sarah Vaulx, late Sarah Henderson’s interest by the terms of the will, determines the character and extent of that of complainants, who claim in remainder. They are entitled, with the excepticn of the property last described, to a moiety of the real ar.d personal estate of the testator, on the termination of the life estate interest of the said Sarah; and as next of kin and heirs at law of said testator, they may become entitled to the other moiety, if said Sarah should not, at her depth, execute the power under the will, and make disposition of that moiety. These points have been discussed with much zeal and learning by the counsel, but it is believed that they do not present very much that is either novel or difficult.
We approach now, however, a question of much magnitude and difficulty. I feel its pressure extremely. It Is of vital importance, not only to the parties to this record, but to the community at large — I mean the relief to which complainants may be entitled. Complainants insist in their bill, *36 anc* *n arSumentsJ t'iat was tbo intention of (bo testator that the wife’s negroes ami other property should remain upon the farm, upon which ho had lived, and that this court should enforce that intention, so far at least as to direct that the negroes be returned and continued there. 'Hiere is enough in the will to make the impression, that the testator cherished an expectation, perhaps Lit a wish that his wife,with her property, should remain on the estate. The direc--iron not to sell any cf the property, considering its character' as disclosed in the inventory, with the injunction to be governed by the counsel of L. Henderson and S. Anderson, are of a character to produce this impression; but they are not strong and distinct enough to induce the court to restrain: her from quitting the premises with her property. Defendants insist, that they have a right to remove the negroes and themselves to the Gtate cf Mississippi, where slave laboi is more profitable, for the purpose of niching said slaves more beneficial to them, in the culliiio cf coitcu; that ibis-right results from their limited owucisblp in said slaves and other property, which so long as u continues is absolute, and must not bo impaired or interfered with, by fixing at the ill-stance of complainants, said p;cper:y within the limits of this state. They urge that cempdalnants are entitled to no relief, except to the filing an invenicry and a report ft cm time to time cf the incienso cf the p .cpr.-ty. It is said, and correctly said, that dtixur.h fruncí ¡y the very relation of owner for Ihb and ren.alr.der nun hr¡xu ed upon the firmer the necessity cf gui..,, ciby for the forthcoming of the propelty a: tno termination of the life psí¡:ío, ye:, the cot:;sc now is, nof to give null s: y, . • w; f in ct:scs cf danger.. .! .. ,¡r-but s-ii inventory. Audi tin y insist that at :: c pose cf vemeving the slave;; <"ut of the state wcu’d amount to a case of wiiiuu t.:c .:i:i" of the authorities, the condition of their Isom!, if one hi required of then, must be merely for the fculiccmiug cf the negrees at the death v,f Oarab Taub:, and not h'-r their cor.iit.uanco within the limits cf Tennessee. ri he ccmplainr.uts insist-that they are entitled to a forthcoming bond, with seeuiity, containin'* the last mentioned condition. This is the gieat point *37 jn the cause, sjrotviug out of the relation which the parties sustain to the negroes in controversy. Two positions o J i alike obvious and important: first, the defendants having tho 1 . ° life estate interest, arc entitled to tho useittl and profitable enjoyment of the property, so far as it may be consistent with its preservation, with its usual and ordinary increase, and with the reeurity cf the title to it. Secondly, That those in remainder, the complainants, wl ore beneficial use and enjoyment of the property is postponed till the determination of the interest of the defendants, have a right to be protected and secured against probable danger of its destruction, against more Ilian ordinary destruction, cr any hazard of the title. Those principles apply in some degree to the relation cf tenant for life and remainder man in real estate, as involved in the doctrine cf waste at the common law, or they may be deduced more properly from this latter relation. But the property in slaves, and in their increase, resembling in its durability in some degree the property in lands, yet from the peculiar nature of the subject, differing from it in so many striking and essential particulars, asserts its own peculiar principles in ascertaining the rights and liabilities between the owner in possession and owner in remainder.
It is but recently, in this state at least, that the peculiar nature and character of slave property, end-of the relation between master and slave, have been regarded in our courts in the spirit of a rational and humane philosophy. A few years ago, and any man who had a judgment debtor, might by virtue of an c:l\ cufien rgrfirst him, become the owner of the slave- cf a third party, if he chose in a suit at common law, to pay the value cr mere than the value. A court of chancery, if tho owners had there sought to restrain the bill, or recover the possession, closed its doers upon him, with the information given him, that he had a clear and unembarrassed remedy at law. Afterwards it was discovered as wines, family pictures and p..Ue, and ornamental trees, &c. were protected to tho owner in a court of chancery against trespass, so might a slave, if a family slave-, and a peculiar favorite with his master. But recently, upon grounds less technical and far higher and sounder, it has been deter- *38 m'net* ihat a court of chanceiy will protect the possession and enjoyment of this peculiar property, a property in intellectual and moral and social qualities, in skill, in fidelity and in gratitude, as well as in their capacity lor labor; and any owner may now say and show to a court of cliantery, I am master, this is my slave, and ho shall retain or recover the possession. These principles, founded upon the nature of the properly, will necessarily embrace the rights and liabilities affecting the present and future owners, the party in possession and the party in remainder. The remainder man is owner,-and entitled to be secured in the specific slaves and their increase, and not merely in their value, or even more than their value. If the owner for life may remove with the negroes to Mississippi or Louisiana, how is the remainder to be secured? It is answered, by a bond with security here, 10 have the negroes forthcoming at the death of the remainder man. Without urging how precarious such security would be, after the lapse of some twenty cr thirty years, by the death of sureties,-the operation of cur statutes of descents and distributions, and the commercial and ever changing character of our country; without insisting how improbable it would be that those in remainder would get any available remedy upon the bonds, let us suppose that in this case, a bond with ample security shall be taken, that the defendant, his wife, and his negroes go to his farm in Mississippi, and that contrary to the probability of tho case, tho wife dies in a short time, while the sureties arc yet good. The complainants want tho negroes specifically, they aro favorite negroes, family negroes, at all events they wish tho possession of diem, how should they recover it? They can only sue upon the bond. In that bond they will not recover the negroes, but their value here, or their value in Mississippi, but probably the former; but suppose the latter, the defendants in exoneration of his sureties pays the money here, as he, needing the negroes would be sure to do, and then the matter ends in a compulsory sale through the agency of this court, and a court of law. If complainants sue in Mississippi will they recover the negroes specifically; we know not their system of laws. This single view of the subject seems to *39 be decisive. When the negroes leave this stale and go beyond the jurisdiction of its lavs, we have no further control over-tliem; they may be hired, sold, emancipated, and dispersed through every slavcholding or non-slaveholding state in the Union, cr out of the Union. And if, as matter of right the life estate owner can give the bonds and go where he pleases with the negroes, for it results in that, if he remove where wo direct or permit him, he m¡ y afterwards remove a dozen times; if he can do this of right, then every owner of a life estate can, by giving bond, compel those in remainder hereafter to receive, if they can recover indeed, the money value of their negroes. There are many other views leading to the same result. Our state constitution prohibits the emancipation without compensation to the owner. If the negi oes arc taken to asíate where the fundamental law differs, the title is less secure. The complainants are members of this political community, and have a voice in the formation of its laws; if removed, their slaves would be under a system cf laws, in the formation of which they would have no voice. We have a wild penal code, as regards slaves, as well as others; they might be taken wheie this would be otherwise. We have a much greater portion of free than of slave population; and the slave, without severity, is kept in a due and safe subordination; they might be taken where (he proportion is the other way, and where weakness cn one side and rashness on the other, might lead to insurrection and consequent destruction of the slave. Here there is a liberal philanthropy and protective public sentiment to the slave — there it might be otherwise. Here the annual profit of the slave’s labor bears no very large proportion to bis own value, and of course interest is on the side cf humanity, and he may not be over worked — there the annual profit may be one third of his entire value, and the temptation would he to overwork him. Here the moderate annual profit of the slave’s labor makes an increase of the stock an object, and mothers and children are tenderly treated — there a different state of things may produce a different feeling and a different course. Here we have a temperate, healthful climate — there the climate may be less favorable to *40 life. Here, those in remainder could know the state and . 'Condition of the property, ascertain whether it was humanely or cruelly treated, be informed of its increase, preserve the evidences cf its identity, and their ownership — there, unless they should remove thither, they would be ignorant of all these subjects, and that ignorance would peril their title and interest in the property.
This case has not before occurred. The only cases which have been before our courts have been when the tenant for life was about to run away with or sell the property; but as far as they go they fortify the position I have taken. In the case of McCutchin & others vs. Price, wife & others, 3 Hay. 211, when the complainants had a very precarious, indeed the court sjjs only a possible interest, Judge Roane says, “that when a sale or removal is intended, or likely to take place, títere security ought to be required, and he ordered defendants to enter into a bond, with security, &c., conditioned that he would not remove said negroes beyond the limits of the state, nor otherwise dispose of them, so as to impair the interest of those in remainder,” &c. If, in the conclusion on this point of the case to which I have arrived, by the aid rather of principle than of authority, I have erred, the error can with little inconvenience be corrected.* But if I am right, and the general interest of the community is in opposition to these views, there is an appropriate department to which the correction belongs.
Decree affirmed.

 This opinion was delivered by Judge Reese, when he was chancellor, the decree was appealed from. The Supreme Court adopted the opinion and affirmed the decree of the Chancery Court.